# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| | ) | Criminal Action No.: 2:09-1127-PMD |
| v. | ) | |
| | ) | |
| Robert A. Kohn, | ) | |
| | ) | **ORDER** |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on Defendant Robert Kohn's ("Defendant") motion to dismiss the indictment for prosecutorial misconduct before the grand jury; a motion to dismiss the indictment for being outside the statute of limitations; a motion to strike various portions of the indictment; a motion for a bill of particulars; and a motion to compel. In addition to their briefs, the parties presented oral arguments before the court on March 10, 2010.

## BACKGROUND

In a one-count indictment, the Government accuses Defendant of committing mail fraud in violation of 28 U.S.C. § 1341. According to the indictment, Defendant was hired by Roy Knight, the owner and/or operator of Knight's Piping and Knight's Services, to assist these companies with matters related to workers' compensation insurance. The Government charges that starting in 2002 and continuing through at least 2004, Defendant devised a scheme to defraud Companion Property & Casualty Insurance Company, the worker's compensation insurance provider for Knight's Services, by discussing with Roy Knight the possibility of understating Knight's Services' total payroll figure to Companion's workers' compensation auditor in order to significantly reduce the company's year-end final billing from Companion. Moreover, the Government alleges that Defendant carried out this scheme on or about December 18, 2002, when he met with the workers'

compensation auditor for the 2002 audit, by reporting Knight's Services' total payroll to be $60,576, when in fact the total payroll was approximately $603,180. The Government further alleges that on or about January 29, 2004, Defendant reported or caused to be reported to a workers' compensation auditor performing the 2003 audit a payroll total for Knight's Services of $141,431, when in fact the actual payroll total was approximately $693,608. Finally, the Government alleges that on or about December 10, 2004, Defendant met with a workers' compensation auditor for the 2004 workers' compensation insurance premium audit and reported to the auditor that Knight's Services' total payroll was $173,562, when in fact the total payroll was approximately $1,090,817. Because of Defendant's participation in this scheme, the Government believes Companion suffered a loss of approximately $206,233 during the 2004 policy year and lost approximately $174,803 during the 2002 and 2003 policy years.

As for the offense charged, the Government alleges that Defendant did cause a Knight's Services check, numbered 14890 and in the amount of $3,353, to be delivered by the Postal Service on or about January 12, 2005, for the stated purpose of fraudulently reducing Knight's Services' workers' compensation insurance premium that was payable to Companion, which administered the 2004 policy for the State of South Carolina.

## ANALYSIS

### I. Motion to Dismiss Indictment for Prosecutorial Misconduct Before Grand Jury

Defendant first moves to dismiss the indictment on the basis that the grand jury process was rendered unfair due to prosecutorial misconduct which allegedly unconstitutionally tainted the grand jury's decision to indict him. A district court may dismiss an indictment for errors in grand jury proceedings when a defendant shows that such errors actually prejudiced him. *Bank of N.S. v. United*

*States*, 487 U.S. 250, 254 (1988); *United States v. Feurtado*, 191 F.3d 420, 424 (4th Cir. 1999). Prejudice can "amount either to proof that the grand jury's decision to indict was substantially influenced, or that there is grave doubt that the decision to indict was substantially influenced, by testimony which was inappropriately before it." *Id.*

Defendant contends that he was actually prejudiced by the misconduct of the prosecutor during the presentment of the indictment to the grand jury because the prosecutor undermined the independence of the grand jury by presenting the indictment as "a formality needed to convict the co-conspirator of an admitted criminal." (Def. Mot. at 5.) Defendant bases this argument on the fact that the prosecutor read the first sentence of the first paragraph of the indictment to the grand jury, which states that Roy L. Knight is "a previously-charged co-conspirator" of Defendant, and then later interjected during the reading of the indictment:

> Just so you know and Agent Hawkins will tell you this, you heard me say that Roy Knight had previously been charged. He pled guilty to an information which doesn't have to come in front of a Grand Jury and has already done that down in Charleston.

(Def. Ex. A, Grand Jury Hr'g Tr. 2:23–3:3.) After making this statement, the prosecutor continued on with his recitation of the indictment, and Defendant believes this interjection impressed on the jury that Roy Knight's guilty plea is evidence of Defendant's guilt.

Defendant also complains of the prosecutor's following questioning of FBI agent Aaron Hawkins during the grand jury proceedings:

> Q. And were you involved in the investigation of Roy Knight and Robert Kohn?
> A. Yes.
> Q. And did that involve fraud related to workers' compensation audits and insurance premiums for the years 2002 through 2004?
> A. Yes
>
>     . . . .

3

> Q. And Roy Knight has already pled guilty; is that correct?
> A. Yes.
> Q. And he pled guilty essentially to the same charges that are now being pursued against Mr. Kohn; is that correct?
> A. That's correct.

(*Id.* 10:17–11:14.) Later in his testimony, FBI agent Hawkins stated:

> [Roy] Knight, again, all three years had knowledge that bogus payroll totals were being provided to auditors. He approved of it. And matter of fact, he's pled guilty obviously, as I earlier stated, to essentially the same mail fraud charge that's being pursued against Mr. Kohn.

(*Id.* 18:22–19:2.) And again, when discussing the alleged loss to Companion because of Defendant's scheme, Agent Hawkins mentioned Roy Knight's guilty plea: "Those are approximate numbers and they're the same numbers, I believe, that were used when Mr. Knight pled guilty." (*Id.* 21:3–5.) Finally, later in the proceeding, a member of the grand jury inquired about the prosecutor's mentioning of Roy Knight:

> The Foreperson: You have mentioned that Roy Knight has been—I don't know if you really said prosecuted, but—
>
> Mr. Holliday: Here's how that system works. Certain defendants plead guilty to an information. That means they acknowledge the charges. They don't have to come before you as a Grand Jury. I raised that to you because I didn't want you to think—you know, Roy Knight is mentioned in the indictment.
>
> The Foreperson: And his secretary.
>
> Mr. Holliday: And his secretary as well. So normally people have questions as to why isn't that person being brought in front of us today or not.
>
> The Foreperson: Right
>
> Mr. Holliday: So Roy Knight agreed to the charges basically and signed a plea agreement and went in front of the Court down in Charleston, so that's why you're not considering Mr. Knight. And then with the secretary, you always have to draw a line as to the degree of culpability and to the extent to which somebody is listening to what her boss tells her to do or somebody else tells her to do. So it was our decision not to prosecute her even though she was interviewed by Agent

4

> Hawkins and he provided some information to you based on that interview. There's some value to us in that as well, so. Anyone else?
>
> Grand Jurors: (No response.)
>
> Mr. Holliday: Okay. Thank you very much. We'll be outside if any questions come up during your deliberations.

(*Id.* 26:25–28:7.) Defendant believes these five references to Roy Knight's decision to plead guilty to the same charges he faces, after identifying Knight as a "co-conspirator," had no relevance to the Government's case against him and were only made to encourage the jury to find Defendant guilty by association. He believes the grand jury member's question about Mr. Knight evidences the effect the prosecutor's misconduct had on the grand jury. Moreover, Defendant emphasizes that these five instances were not isolated misstatements from a multi-day hearing; but instead, because the grand jury proceeding was very short in duration and only consisted of one witness, Agent Hawkins, it made up quite a bit of the testimony provided. Finally, Defendant believes the prosecutor assumed the role of witness during the grand jury proceedings, by using leading questions and by fielding questions from members of the grand jury and answering it for them. For all of these reasons, he asks the court to dismiss the indictment because he believes he was actually prejudiced by this alleged prosecutorial misconduct during the grand jury proceedings.

In its response, the Government argues that Defendant has failed to show he was actually prejudiced by the mentioning of Roy Knight's guilty plea and believes the entire transcript of the grand jury proceeding reveals that there is not a "grave doubt" that the grand jury's decision to indict was substantially influenced by inappropriate testimony. As for the grand jury member's question, the Government explains that the question was directed more at how the decision to charge someone is made and argues that the question does not evidence any improper effect on the grand jury by the

introduction of testimony that Roy Knight pled guilty to similar charges. Because Roy Knight controlled Knight's Services and was a part of the scheme to defraud Companion, the Government believes the indictment properly states that Defendant was a "co-conspirator" of Knight and believes the prosecutor needed to address the status of Mr. Knight for the grand jury's understanding of the big picture.

After reading the entire transcript of the presentment of the indictment to the grand jury, the court does not find that the prosecutor's reference to Roy Knight as a "co-conspirator" of Defendant and reference to the fact that he pled guilty to similar charges actually prejudiced Defendant. There is other testimony from Agent Hawkins, which sufficiently establishes probable cause to support the mail fraud charge contained in the indictment. First, during his testimony, Agent Hawkins explained to the grand jury how Companion calculated its premiums for workers' compensation coverage, and he testified that Defendant was hired by Roy Knight to handle the workers' compensation audits for Mr. Knight's company, Knight's Services. (Def. Ex. A, Grand Jury Hr'g Tr. 15:18–16:2.) He then testified that Defendant informed Mr. Knight of his need to manipulate payroll totals for the 2002 policy year before the 2002 year-end audit to successfully initiate the scheme to defraud Companion. To do so, Knight had his secretary print off a Quick Books report of Knight's Services' payroll figures, and she gave the report to Defendant. Defendant then manipulated the payroll report by making changes to worker classifications and deleting certain employees, and he then had the secretary make a new Quick Books payroll report based on the changes, which resulted in a reduced amount. (*Id.* 17:4–21.) Then on December 18, 2002, Defendant met with Companion's workers' compensation auditor, and he reported to the auditor that Knight's Services total payroll was approximately $60,576, when in fact the total payroll was $603,180. (*Id.* 17:22–18:1.)

6

Agent Hawkins further testified that Defendant piggy-backed off of the fraudulent numbers from the 2002 year-end audit to receive a lower initial premium for the 2003 policy year, and at the 2003 year-end audit, Defendant again provided the auditor with fraudulently understated numbers so Knight's Services could pay a lower premium. (*Id.* 18:6–12.) He testified that Defendant conducted himself in the same way with respect to the 2004 policy year and, what is more, that Defendant admitted meeting with the auditor on December 10, 2004 for the purpose of completing the 2004 year-end audit. (*Id.* 18:13–21.) He testified that Defendant helped Knight's Services avoid paying Companion approximately $206,233 for the 2004 policy year by understating the total payroll for Knight's Services for that year. (*Id.* 19:6–11.) He further testified that the total loss to Companion for the period of 2002–04 was $381,000. (*Id.* 19:18–20.)

In return for his work to reduce the 2004 policy premium, Defendant received $10,000, which is supported by a check that is dated approximately one month after Defendant met with the auditor. (*Id.* 19:21–20:3.) He informed the grand jury that Roy Knight provided information that Defendant initially wanted $20,000 for his work during the 2004 year-end audit, but that he only agreed to pay Defendant $10,000. (*Id.*) He testified that Defendant mailed check number 14890 for $3,353 from Summerville, SC to Companion in Columbia, SC to pay in full Knight's Services' premium for workers' compensation coverage in 2004. Of course, this check should have been for $106,233 more. (*Id.* 20: 4–18.) Agent Hawkins informed the grand jury that the FBI was able to determine the amount by which Defendant understated Knight's Services' total payroll figure because Knight's Services was required to report detailed information about what employees earn to the Employment Security Commission, and the Security Commission's records, along with information provided by Roy Knight and his secretary, allowed the FBI to determine the

7

approximate amount of the actual payroll for the years 2002 through 2004. (*Id.* 21:15–22:13.)

Based on this testimony, the grand jury could have found probable cause to support the mail fraud charge without considering any of the testimony that referenced Mr. Knight as a co-conspirator of Defendant. While both he and the prosecutor did make the grand jury aware of the fact that Roy Knight pled guilty to a similar charge, Agent Hawkins testified that it was Defendant's individual conduct that carried out the scheme, which indicated that he was the main perpetrator of the alleged fraud. Therefore, the court finds that Defendant was not actually prejudiced by the five references to Roy Knight pleading guilty during the presentment of the indictment and denies Defendant's motion to dismiss.

## II.     Motion to Dismiss the Indictment as Outside the Statute of Limitations

Defendant next moves the court to dismiss the indictment because he believes the statute of limitations precludes the prosecution of this action. To better understand Defendant's argument, a brief summary of how Companion calculated Knight's Services workers' compensation premium is helpful. Knight's Services owed its workers' compensation premium on a yearly basis, and the premium was based largely on the company's total payroll amount. Before a new policy year began, Companion would estimate Knight's Services' total payroll figure for that year and determine an initial premium based on this estimate. At the end of the policy year, Companion conducted an audit of Knight's Services' payroll to determine the actual payroll for the year. If the audit uncovered an actual payroll figure higher than the payroll figure was originally estimated, Knight's Services would have to pay an additional insurance premium payment to make up the difference between the estimated cost for coverage and the actual cost for coverage. Moreover, Companion used the year-end audit to estimate Knight's Service's payroll figure for the upcoming policy year and to

8

determine an initial premium payment for that year's policy.

At the outset, Defendant takes issue with the fact that, in the indictment, the Government characterizes the scheme to defraud as an ongoing artifice, by alleging that it began in 2002 and continued "through at least 2004;" yet, the indictment describes the workers' compensation insurance process as a process renewed each year and specifically addresses the Defendant's alleged scheme to defraud Companion in the separate policy years of 2002, 2003, and 2004. In other words, Defendant believes the government seeks to have the court view the scheme to defraud as ongoing between 2002 and 2004; yet it drafted the indictment as if a new fraudulent scheme was formed each year. Defendant believes the indictment can only be read to accuse Defendant of devising a scheme to defraud, which began in 2002 and ended in that same year. Again, his reasoning for adopting such a position is based on the following: the indictment alleges that Defendant devised a fraudulent scheme "[s]tarting in 2002;" the indictment explains Defendant's alleged fraudulent conduct for each year Knight's Services applied for workers' compensation insurance—which necessarily begins with an estimate and concludes with a year-end audit; and the indictment fails to allege that another fraudulent scheme ever began after 2002. Based on this view of the allegations, he argues that it is "a legal and factual impossibility" for the mailing in January 2005 to have been material to or in furtherance of the alleged scheme, whose ends were accomplished in 2002.

Additionally, Defendant contends that the five-year statute of limitations bars the prosecution of this action. Relying on his belief that the indictment only alleges a scheme to defraud for the 2002 policy year, he contends that the Government's October 21, 2009 presentment of the indictment came after the statute of limitations had run. Since the indictment fails to allege that Defendant committed an act in furtherance of the scheme to defraud after October 21, 2004, Defendant believes

9

the court should dismiss the indictment.

The Government responds by arguing that the scheme is not limited in time simply because the indictment charges Defendant with only one mailing. Although the Government believes Defendant committed several illegal acts in furtherance of the alleged scheme to defraud between 2002 and 2004, it explains that it chose to only charge him with one of those acts—a count of mail fraud based on the January 2005 mailing in furtherance of the fraud related to the 2004 policy year. Nevertheless, it believes the Defendant's conduct in 2002 and 2003 are relevant to the execution of his scheme in 2004, for which Defendant is charged. Therefore, the Government contends that simply because the indictment describes events taking place in 2002, 2003, and 2004 does not mean that the Defendant derived a separate scheme in 2002, a separate scheme in 2003, and a separate scheme in 2004. Instead, the Government believes the indictment clearly reflects that Defendant carried out the same scheme all three years.

After considering the parties' arguments, the court finds for the Government on this point. It is clear from the indictment that the Government accuses Defendant of deliberately understating the payroll figure for Knight's Services in an effort to pay lower workers' compensation premiums and that it believes he did so for workers' compensation policies issued in 2002, 2003, and 2004. Such a reading does not allow the Government to "constructively" amend the indictment "from one that did not state an offense to one that does," as argued by Defendant. Therefore, the court finds that the indictment accuses Defendant of devising a single scheme to defraud, which he allegedly carried out for three years, regardless of the fact that the indictment did not expressly state that a separate scheme "began in 2004."

Defendant argues that even if the court finds the indictment accuses Defendant of devising

a scheme to defraud in 2004, the court should still dismiss the indictment because the indictment fails to allege that Defendant mailed "a material statement in furtherance of the scheme," which is an element the Government must prove to make its mail fraud case against Defendant. *Neder v. United States*, 527 U.S. 1, 20 (1999). First, Defendant argues that the January 2005 mailing "constitutes a post-fruition mailing" not done in furtherance of the alleged fraudulent scheme. According to Defendant, the fraudulent scheme had already reached fruition in 2004 when he allegedly understated Knight's Services' total payroll figure, and the subsequent January 2005 mailing was not for the purpose of executing the scheme. At most, Defendant asserts, the mailing of the check was a "post-fraud accounting."

Defendant cites a number of cases to support his argument, but primarily relies on three cases. First, Defendant cites to *Kann v. United States*, 323 U.S. 88 (1944), where defendants set up a dummy corporation through which to divert profits to themselves, and as part of the scheme, the defendants caused the corporation to issue two checks payable to them. The defendants cashed these checks at local banks, which then mailed the checks to the drawee banks for collection. The Supreme Court held that the mailing of the cashed checks to the drawee banks could not supply the mailing element of the mail fraud charge. Next, Defendant cites to *Parr v. United States*, 363 U.S. 370 (1960), where defendants were charged with having fraudulently obtained gasoline and a variety of other products and services through the unauthorized use of a credit card issued to the school district which employed them. The mailing element of the mail fraud charges was purportedly satisfied when the oil company that issued the credit card mailed invoices to the school district for payment, and when the district mailed payment in the form of a check. Relying on *Kann*, the Supreme Court held that these mailings were not in execution of the scheme as required by the

11

statute because it was immaterial to the defendants how the oil company went about collecting its payment.

Lastly, Defendant primarily relies on *United States v. Maze*, 414 U.S. 395 (1974), where defendant allegedly stole his roommate's credit card and obtained food and lodging at motels by placing the charges on the stolen card. The mailing element of the mail fraud charge was supplied by the fact that the defendant knew that each motel proprietor would mail an invoice to the bank that had issued the credit card, which in turn would mail a bill to the card owner for payment. The Supreme Court found that these mailings could not support mail fraud charges because the defendant's scheme had reached fruition when he checked out of each motel. The success of his scheme in no way depended on the mailings; they merely determined which of his victims would ultimately bear the loss. With this case law in mind, Defendant contends that the check mailed in January of 2005 was not a "material" statement made in furtherance of the scheme because it was the understated payroll figure that reduced Knight's Services' premium payments, and once the understated payroll was provided to Companion, the scheme was carried out, making the mailing of the check to pay the reduced premium only incidental to the scheme.

Contrary to Defendant's assertions, it appears that the alleged January 2005 mailing is precisely the event that executed the fraud on Companion. Moreover, the facts of this case are distinguishable from the facts of the cases cited by Defendant, in that *Kann*, *Parr*, and *Maze* all involved a secondary mailing executed by non-parties to the scheme. As already discussed, the 2004 year-end audit was when Companion's auditor determined how much Knight's Services actually owed for its workers' compensation coverage in 2004. Because Defendant understated the 2004 year-end payroll figure, Knight's Services only paid an additional premium of $3,353 in January

2005, when, according to the Government, the actual cost for Companion's workers' compensation coverage would have been approximately $200,000 more had Defendant reported the correct payroll figures to the auditor. While the understated payroll figure certainly played a key role in fraudulently reducing Knight's Services premiums, it was the mailing of the check that completed the scheme to defraud Companion, as the act of mailing the check implied that Knight's Services was meeting its obligations. As the Supreme Court recently noted, "[T]he gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element, . . . even if the mailing itself 'contains no false information.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131, 2138 (2008) (quoting *Schmuck v. United States*, 489 U.S. 705, 712 (1989)). Moreover, the Fourth Circuit has found that:

> [a] mailing is considered to be 'for the purpose of executing' a fraudulent scheme if it is 'designed to lull the victims into a false sense of security,' even if it is 'incident to an essential part of the scheme.' Thus, a mailing that is accurate, routine, or sent after the goods have been received can support a mail fraud conviction, so long as the mailing was designed to 'make apprehension of the defendant[] less likely.'

*United States v. Bradshaw*, 282 F. App'x 264, 267 (4th Cir. 2008) (quoting, among other cases, *United States v. Lane*, 474 U.S. 438 (1986)); *see also Schmuck v. United States*, 489 U.S. 705, 710–11 (1989) ("To be part of the execution of the fraud, however, the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot."). From the record before the court, it is clear that, even if the mailing of the check was not considered a material statement made by Defendant in furtherance of the alleged scheme to defraud, it certainly was an incidental to an essential part of the scheme and satisfies the mailing requirement of the alleged mail fraud offense. Furthermore, since the mailing was made in January of 2005, the act was made within five years of the indictment's filing date of

13

October 21, 2009, as required by the statute of limitations. *See* 18 U.S.C. § 3282. Therefore, the court denies Defendant's motion to dismiss.

### III. Motion to Strike

Pursuant to Federal Rule of Criminal Procedure 7(d), Defendant next moves the court to strike several parts of the indictment. Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Pursuant to Rule 7(d), it is within the court's discretion to strike "surplusage" from an indictment, and the Fourth Circuit has held that a motion to strike should be granted if it is clear that the challenged allegations are (1) not relevant to the charge or charges; (2) inflammatory; and (3) prejudicial to the defendant. *United States v. Williams*, 445 F.3d 724, 733 (4th Cir. 2006) (internal citation and quotation marks omitted) (emphasis added). Defendant asks the court to strike two portions of the indictment: (1) language that identifies Defendant as the "co-conspirator" of the "previously charged" Roy Knight; and (2) the allegations of a scheme to defraud in 2002 and 2003.

#### A. Co-Conspirator Language

First, Defendant asks the court to strike the language in the first sentence of the indictment that identifies Defendant as a "co-conspirator" of "previously charged" Roy Knight, who has since plead guilty to similar charges. Because the indictment does not charge Defendant with conspiracy and that charge was not presented to the grand jury, he believes this language permits the Government to unilaterally declare Defendant a "co-conspirator," which constitutes a prejudicial, unproven fact. Thus, Defendant believes the court should strike the "co-conspirator" language from the indictment because it unnecessarily encourages the jury to misuse the indictment as evidence

14

against him, or in other words, it permits the jury to be persuaded that he is guilty because Roy Knight pled guilty. In response, the Government argues that a conspiracy between Roy Knight and Defendant existed based on the facts of the case, and that the use of the terms "conspiracy" and "co-conspirator" is not restricted to those cases where a violation of a conspiracy statute is charged. The court believes the "co-conspirator" language qualifies as surplusage and grants Defendant's motion to strike this language. The Government can replace this term with the term "employer" or another synonymous term or phrase.

### B. Allegations of a Scheme to Defraud in 2002 and 2003

Defendant also asks the court to strike paragraphs 3, 8–11, and 15 from the indictment, all which contain language of Defendant's alleged scheme to defraud in 2002 and 2003. Because the indictment only charges him with the January 12, 2005 mailing in furtherance of the scheme to defraud Companion out of higher premium payments during the 2004 policy year, Defendant contends that any allegations related to a scheme to defraud in 2002 and 2003 are mere surplusage and unnecessary in making out a prima facie pleading of the mail fraud violation. In response, the Government contends that these allegations are relevant to the charged conduct and constitute background information about conduct that was integral to the scheme to defraud. More specifically, the Government believes the allegations of Defendant's activity that took place in 2002 describe the genesis of the scheme, while the allegations of Defendant's conduct in 2003 shows the continuation of the scheme, prior to its culmination and discovery in 2004. Since the allegations are relevant, the Government believes the court should deny Defendant's motion to strike them. The court agrees with the Government on this argument and denies Defendant's motion to strike these paragraphs from the indictment.

## IV. Motion for Bill of Particulars

Defendant also moves the court to require the Government to provide a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure because he believes the indictment's "broad and conclusory allegations do not define which of the conduct the government believes to be criminal and why," and because "the indictment fails to provide the requisite particularity" for Defendant "to prepare a defense, to avoid prejudicial surprise at trial, and to protect against being placed in double jeopardy in subsequent proceedings." Therefore, Defendant has provided the court with approximately sixteen questions he wants the court to require the Government to answer. The Government argues that the indictment in this case is not vague, but is a "substantial, fact-laden document that clearly articulates the crime committed, along with important background and explanatory information."

Federal Rule of Criminal Procedure 7 (c)(1) requires that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged," and the Sixth Amendment provides that the accused has the right "to be informed of the nature and cause of the accusation." A bill of particulars is appropriate when an indictment fails (1) to provide adequate information to allow a defendant to understand the charges and (2) to avoid unfair surprise. *See United States v. American Waste Fibers Co.*, 809 F.2d 1044, 1047 (4th Cir. 1987). Providing discovery is not a basis for a bill of particulars. *United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985) ("A bill of particulars is not to be used to provide detailed disclosure of the Government's evidence in advance of trial.").

The court denies Defendant's motion for a bill of particulars. While Defendant complains of the fact that the government has had years to investigate Defendant's conduct and he has had a

shorter period of time to understand the facts of this "complex case," the indictment plainly states both the scheme Defendant allegedly executed to defraud Companion and the number and amount of the check he mailed to further the scheme, along with the date he mailed it. It further identifies the dates of the fraudulent year-end payroll submissions to Companion, the business in question and its owner, being Knight's Services and Roy Knight. In addition to the indictment, Defendant has the testimony of Agent Hawkins during the presentment of the indictment to the grand jury to work with, and the Government has provided him with 3,000 pages of discovery related to the case. Moreover, the Government asserts that it has provided Defendant with a spreadsheet created by Agent Hawkins to assist Defendant in understanding the loss calculations charged, even though this was work product. Lastly, and probably the most telling reason to deny Defendant's motion, Defendant filed a compelling motion to dismiss the indictment based on his belief that the alleged criminal conduct fell outside of the period provided by the statute of limitations. Therefore, it appears Defendant understands the charge against him, and there is little indication that he will be surprised at trial. Therefore, the motion is denied.

## V.     Motion to Compel Discovery

Lastly, Defendant moves the court to compel discovery. He requests eleven different types of information from the Government, and all but one of these requests were resolved and ruled on at the hearing before the court on March 10, 2010. The only remaining issue between the parties is whether or not the Government is required to provide Defendant with a document from the personnel file of FBI Agent Aaron Hawkins, which is an attorney's letter to Agent Hawkins that questioned the manner in which Mr. Hawkins' conducted his investigation in his client's case. Defendant believes he is entitled to this evidence because it goes to Mr. Hawkins' credibility as an

FBI agent. After conducting an in camera inspection of this evidence, the court denies Defendant's motion to compel this documentary evidence. It is not relevant to this case, as it concerns a matter wholly unrelated to this case and does not contain any information which would have any tendency to prove Agent Hawkins' investigation in Defendant's case more credible or less credible. Moreover, even if this document was deemed relevant, the court finds it would only confuse the jury because it merely amounts to an attorney's desire to have Agent Hawkins see the unrelated case from his client's perspective.

### CONCLUSION

For the reasons stated above, the court **DENIES** Defendant's motion to dismiss the indictment for prosecutorial misconduct before the grand jury; **DENIES** Defendant's motion to dismiss the indictment for being outside the statute of limitations; **GRANTS IN PART AND DENIES IN PART** Defendant's motion to strike various portions of the indictment; **DENIES** Defendant's motion for a bill of particulars; and **DENIES** Defendant's motion to compel.

**AND IT IS SO ORDERED.**

_____
PATRICK MICHAEL DUFFY
United States District Judge

**May 3, 2010**
**Charleston, SC**